
FILED
SEP 0 1 2017
Clerk, U.S. District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTIAN NAVA,<br><br>Defendant. | CR 17-47-BLG-SPW<br><br>OPINION & ORDER |

Defendant Christian Nava is charged with Possession with Intent to Distribute Methamphetamine, Possession of Stolen Firearm, and Felon in Possession of a Firearm. (Doc. 2). Nava has moved to suppress evidence obtained from his arrest and government search on December 7, 2016. (Doc. 19).

On August 22, 2017, the Court held an evidentiary hearing. The Court heard testimony from Montana Department of Corrections Probation and Parole Officer Jayson Baxter, and former Montana Violent Offender Task Force Officer Micky Eckart. Having read and reviewed the parties' submissions and having heard the testimony of the witnesses noted above, the Court DENIES Nava's motion.

**I.    Statement of Facts**

In the fall of 2016, Nava was out on parole. In October, Nava's parole officer, Officer Pisk, issued a warrant for Nava's arrest. In November, Pisk

requested assistance from the Montana Violent Offender Task Force (Task Force) in locating Nava. Nava's warrant was assigned to Task Force Officer Eckart. In an effort to locate Nava, Eckart conducted surveillance at Nava's residence for a couple of days. He did not see Nava. Eckart also called Nava's employer and determined that Nava had not been employed for approximately a month.

In December, Eckart received an email from Montana Probation and Parole Officer Reede. In the email, Reede told Eckart that she supervised state probationer Brooke Brown. Reede said that Brown's landlord, Lindsey Bell, had reported often seeing Nava at Brown's apartment and suspected Nava lived there. Eckart testified that he saw a picture of Brown and Nava together on social media. His impression from the photograph was that they were in a relationship.

Eckart talked to Bell the next day. Bell reported that she had seen Nava and his clothing in Brown's apartment. She told Eckart she believed that Nava had been living with Brown for several weeks. She also stated that although Brown had previously been a model tenant, recently Brown had been late on rent and Brown's neighbors complained about increased foot traffic within the last month. Bell gave Eckart keys to Brown's apartment. Eckart called Officer Baxter and discussed entering Brown's apartment to find Nava. Baxter authorized the probationary search of Brown's apartment and agreed to assist. Baxter was made aware, from Officer Reede, in a phone conversation either before or after he talked

to Eckart, that Officer Reede had instructed Brown in late November 2016 not to have contact with Nava.

At around seven a.m. the next morning, Eckart met Baxter and numerous other Task Force officers at Brown's apartment complex. Eckart told Baxter that Bell had texted him that morning. Bell reported that she had received several complaints from neighbors that morning about the noise and traffic at Brown's apartment. Baxter authorized the search of Brown's apartment. Eckart provided assignments to the officers and advised them that the last time the Task Force was involved with Nava, it was rumored he was armed.

The Task Force officers entered Brown's apartment building, knocked on her apartment door, and announced themselves three times. When Brown did not answer, Eckart opened the door using the keys from Bell. Once inside, Task Force officers saw Brown standing at the top of the stairwell. Officers ordered her down the stairs and handcuffed her. She told the officers that Nava was upstairs and that he did not have a gun. While they were talking with Brown, Eckart testified that he heard thumping noises that sounded like furniture moving upstairs. Officers went upstairs, which consisted of a bedroom and a closet. In the bedroom was a mattress sitting on box springs which were sitting on the floor. Nava was nowhere to be seen. Officers found a .40 caliber handgun under the mattress and Nava under the box springs.

Nava was arrested and taken to a patrol car. Because officers found a gun, Baxter requested a probationary search of Brown's apartment. During the search, officers found a ball of plastic containing methamphetamine when they pulled the bed away from the wall. Officers secured the drugs and gun. After running the gun through NCIC, officers discovered it had been stolen out of Mesa, Arizona. Brown was arrested for her probation violations based on Nava being in her apartment and finding the gun and drugs there.

Baxter testified that, at the time, Nava and Brown were subject to the following 'search' condition due to their respective parolee and probationer status:

> Upon reasonable suspicion, as ascertained by a Probation/Parole Officer, my person, vehicle, and/or residence may be searched at any time, day or night. Including my place of employment, without a warrant by a Probation/Parole Officer, ISP Officer or Law Enforcement Officer (at the direction of the Probation/Parole Officer). Any illegal property or contraband will be seized and may be destroyed.

(Doc. 21-1, Conditions of Probation and Parole)

## II. Analysis

Nava argues that because law enforcement did not have probable cause to believe that he resided at Brown's apartment, they lacked authority to conduct a warrantless search of Brown's apartment based on either the arrest warrant or Nava's probationary status. Nava's argument overlooks the effect of Brown's

probationary status on law enforcement's authority to search the apartment, however.

A probationer who agrees under a probation agreement to a search of her residence has a diminished expectation of privacy. *United States v. Knights*, 534 U.S. 112, 119-20. (2001). Thus, "when an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity" the officer may effect a warrantless search of the probationer's residence. *Id.* at 120.

A probation search complies with the Fourth Amendment if it is conducted pursuant to a state law that itself satisfies the reasonableness standard of the Fourth Amendment. *United States v. Conway*, 122 F.3d 841, 842 (9th Cir. 1997) (citing *Griffin v. Wisconsin*, 483 U.S. 868 (1987)). In other words, if state law provides that a probationer's residence may be searched upon reasonable suspicion that the probationer has violated a condition of her probation, a warrantless search of her residence based upon reasonable suspicion does not violate the Fourth Amendment. *Id.* at 842. Montana law provides that a probation officer "may search the person, vehicle, and residence" of a probationer "[u]pon reasonable suspicion that the [probationer] has violated the conditions of supervision," and may use the assistance of law enforcement. Mont. Admin. Rule 20.7.1101(7); *State v. Charlie*, 239 P.3d 934, 941 (Mont. 2010) (citations omitted).

In addition to having reasonable suspicion to believe that a probationer has violated the conditions of her probation, probation officers must have probable cause to believe that the probationer lives at the residence they seek to search. *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2009) (overruled on other grounds by *King*, 687 F.3d 1189).

The Court finds that Eckart had probable cause to believe that Brown lived at the apartment law enforcement searched. Eckart testified that the address was listed as Brown's residence with Montana State Probation and Parole. Additionally, both Reede and Bell confirmed to Eckart that Brown lived there, and Bell gave Eckart a key to Brown's apartment. *See United States v. Grandberry*, 730 F.3d 968, 975 (9th Cir. 2013) ("[P]robable cause as to residence exists if an officer of reasonable caution would believe, based on the totality of the circumstances, that the probationer lives at a particular residence.").

Next, considering the "totality of the circumstances," *United States v. Arvizu*, 534 U.S. 266, 274 (2002), the officers had reasonable suspicion that Brown was in violation of her probation before they searched her residence. Before the search, Eckart had a well-founded suspicion that Brown had been associating with Nava, a known parolee, in violation of her probation conditions. Eckart knew from Reede that Brown was Nava's girlfriend. Bell had told Eckart that she had seen Nava and his clothes in Brown's apartment, despite the fact that Reede had ordered

Brown to stay away from Nava. Bell also told Eckart that neighbors had complained about increased foot traffic and noise at Brown's apartment. The fact that Eckart did not see Nava at his own house during Eckart's couple days of surveillance added to the suspicion that Nava was staying at Brown's apartment. Finally, nothing Eckart observed or learned leading up to the search discounted the information he had received from Bell and Reede. All of this evidence provided Eckart with "a particularized and objective basis for suspecting wrongdoing." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

After law enforcement legally entered Brown's apartment, Brown was asked if Nava was there. She admitted to her (and Nava's) probation violation by replying that he was upstairs. At that point, nothing prevented law enforcement from finding Nava and effecting the arrest warrant. Because Brown was on probation, law enforcement needed only reasonable suspicion to search her apartment. Whether or not law enforcement had probable cause to believe Nava resided at Brown's apartment is irrelevant to the analysis because law enforcement had the legal authority, based on a reasonable suspicion that Nava was staying at Brown's apartment, to enter the apartment due to Brown's probationary status.

### III. Conclusion

For the reasons discussed above, Nava's Motion to Suppress (Doc. 19) is DENIED.

DATED this 1st day of September 2017.

/s/ Susan P. Watters
SUSAN P. WATTERS
United States District Judge